All rise. This court now resumes its session. Please be seated. Good afternoon. The court will now proceed with the argument in Morgan Stanley High Yield Securities, Inc. v. Hans Jecklin, et al., and for the appellant. Appellant we have, I think it's Tamara Peterson. Is that perhaps that right? It's Tamara Beatty Peterson, Your Honor. Thank you. Tamara Peterson, and for the appellees we've got, let's see, is it John Conlon? Yes, Your Honor, John Conlon here, and my colleague, Mr. Kirshner, will be addressing some of the arguments as well, so we will at the appropriate time switch seats. Okay, well, that's fine. Then let us start the argument in a few seconds, but let me first say that the court very much appreciates counsel appearing remotely to argue, to help us with our cases, and with this difficult case at a time when the pandemic's posing risks and difficulties for lots of people. So thank you. We'll proceed with the appellant's argument now. Thank you, Your Honor, and may it please the court, my name is Tamara Beatty Peterson, and I represent the appellants Hans Jecklin, Swiss Leisure Group AG, and JPC Holding AG. With the court permission, I'd like to reserve two minutes for rebuttal, so I will keep track of my time. The district court did not have specific personal jurisdiction over the Jecklin defendants. For the district court to exercise specific personal jurisdiction, there had to be an affiliation between the forum and the underlying controversy involving the defendant. The claim itself had to be one that arises out of or relates to the defendant's forum-related activities. The alter ego claim did not arise out of or relate to the Jecklin defendants' activities. The Jecklin defendants, Hans Jecklin, a Swiss citizen living in Switzerland, two Swiss corporations with their principal places of business in Switzerland, the Jecklin defendants had no involvement with the underlying written transaction, the note purchase agreement. They were not involved in the negotiations. They were not signatories to the note purchase agreement. They did not guarantee the performance of the note purchase agreement. They did not give direction to sign or execute the note purchase agreement. In fact, Hans Jecklin testified that he was told it would not be executed. The note purchase agreement is not a transaction that relates to the forum. The plaintiffs themselves who entered into the note purchase agreement are Massachusetts Business Trust and a Maryland corporation. But counsel, the claim, let's start with just Mr. Jecklin. Maybe the other corporations are different. But at least with Mr. Jecklin, the claim against him is based on an alter ego theory, and that's based on things he did in Nevada, isn't it? Like he traveled there. He attended meetings of the corporations there. Some of the allegedly fraudulent transfers were to improve his residence there. Why don't those contacts count for the personal jurisdiction analysis? That's a very good question, Ryan. It is something I think is very important in this case. Because what the district court essentially did was reach that ultimate question and say, well, Hans Jecklin and Swiss Leisure Group and JPC Holding are the alter egos of Seven Circle Gaming Corporation. Therefore, I will exercise personal jurisdiction over them. That is essentially what the district court did. There is no other connection between the claim, the defendant, and the forum, except for the court's choice that they would be held as the alter egos of Seven Circle Gaming Corporation. But that decision in and of itself was error. Because the district court, when it analyzed the alter ego claims, did not look to Delaware law. Seven Circle Gaming Corporation was a Delaware corporation. The restatement, Second Conflicts of Laws, says that when you look to whether a shareholder is liable for a corporate debt, or whether an officer or director, because Hans Jecklin was only an officer or director of Seven Circle Gaming Corporation. He was not a shareholder of Seven Circle Gaming Corporation. But if you look to the state of incorporation for that corporate, to see the extent and liability of a shareholder or officer for a corporate debt, then you would not do that. If I can stop you there for just a moment, that goes to the merits of the alter ego claim, and I understand you have some questions as to which state's law applies and whether the test is met under whichever state law does apply. But if we assume for a moment that the plaintiffs adequately demonstrated that Jecklin is an alter ego under whatever the applicable law is, would that resolve the personal jurisdiction analysis? Would that answer your personal jurisdiction objection? Because if he's an alter ego, it's because of things he did in Nevada, right? Well, Your Honor, the district court found specific personal jurisdiction, and specifically said that it was not finding general jurisdiction. Now, this court has said previously, I think in the Ransom v. Nike case, that a parent corporation that is an alter ego of a subsidiary, that there could be general personal jurisdiction there. So by reaching the ultimate question, I suppose if this court were to find that there was an alter ego relationship, then I think there is authority to say that that is sufficient for personal jurisdiction. That is not what the district court did. And in general, general jurisdiction wouldn't be applicable here anyway, because Hans Jecklin is a resident of Switzerland and lives in Switzerland, and he's a Swiss citizen, and JPC Holding and Swiss Leisure Group are Swiss corporations with principal places of business in Switzerland. They are not at home in Nevada. The other part of this, Your Honor, is that the alter ego claim that the district court found, the way he characterized it was that this was a question of after a corporate debt had been found, after the judgment had been issued by the New York court, not the forum court, but by the New York court, after the judgment had been found, could an individual become the alter ego of the corporation? And so what the district court did is look at evidence of transfers that occurred after the failure of the note purchase agreement. And what essentially the district court did was transform questions of fraudulent transfer into an alter ego claim. But there is no basis in Delaware or Nevada law to say that after a debt has been incurred by a corporation, that subsequent transfers can somehow transform that into an alter ego claim. And I'd like to point out one important part of this, too, is that the cumulative aggregate sum of all the transfers was approximately $15 million, and yet the district court took that evidence of transfers and accumulated it to the value of the judgment issued out of New York and said that all three defendants were liable on a $38 million judgment. There's no support for that in either Nevada or Delaware law. If I may ask a question about, since you brought up the relationship between the alter ego theory and the fraudulent transfer claims, as a practical matter, if you lose on the alter ego theory and we were to say that, you know, Jekyll and S.L.G. and J.P.C. are alter egos of S.C.G.C., do the fraudulent transfer claims matter? Is there any practical significance to them if we were to say that there's an alter ego relationship? Well, Your Honor, I think that the district court found an alter ego relationship erroneously, but certainly found that and held the Jekyll and defendants liable for the entirety of the corporate debt. And so if this court were to affirm that holding, which I think is an erroneous holding, but then I suppose you wouldn't need to look at the fraudulent transfers at all. Because the ultimate judgment, if that were proper, then I don't think you'd need to reach that. But the concept itself that an individual could become liable for a corporate debt, in an instance when the plaintiffs themselves were not misled about who they were dealing with and what they were contracting for. They were told that it was S.C.G.C. There was no confusion that they thought they were entering into some agreement with Hans Jekyll or S.L.G.C. or J.P.C. holding. They knew who they were contracting with, and they knew that S.C.G.C. did not have the funds to consummate the purchase unless a third party came in with a sale-leaseback of the entire resort at Summerlin. And when they got their judgment against Seven Circle Gaming Corporation in New York, they had even alleged in their complaint that the reason they had filed it in New York, not only is there a choice of law provision in the no-purchase agreement that says that New York law should be applied, but they also said that a substantial part of the events giving rise to the claims took place in New York. And so when you look at the entirety of the alter ego claim, there is no relationship between the forum and the claim of alter ego of a Delaware corporation involving a Swiss national and Swiss companies over a judgment entered between a contract of a Maryland corporation, Massachusetts Business Trust, where the judgment itself was issued by New York. There is no relationship to the forum, not a strong relationship certainly. And the district court's choice of law in using Nevada law was also in error. As I mentioned earlier, the restatement requires that the state of incorporation be applied to determine an alter ego relationship. The consequences of the error are profound, because Delaware law requires a finding of complete domination and control that a parent and a subsidiary operate as a single economic entity. And in order to reach, in Delaware, the ultimate shareholder, Mr. Jekyll, because of course he owned 75% of JPC Holding, and JPC Holding owned 100% of Swiss Leisure Group AG, and Swiss Leisure Group owned Seven Circle Gaming Corporation. In order to reach the ultimate shareholder in Delaware, each and every parent corporation of the chain of ownership must be pierced. The standard of proof in Delaware is higher than a preponderance standard. And the fraud must be found in the defendant's use of the corporate form. The district court didn't make any of these findings, nor could it have, because again, the underlying obligation was a written contract, and the plaintiffs knew with whom they were contracting. Well, there were some findings. I mean, there were a number of findings about sham board meetings and fabrication of minutes and fraud in the use of the corporate form, weren't there? And why isn't that enough? There was a finding by the district court that Hans Jekyll fabricated board minutes and intentionally doctored accounting records. There's no basis for that in the record. Hans Jekyll testified, I didn't draft board minutes. The board minutes that were drafted about the $10 million transfer were drafted by John Tipton, and John Tipton testified that he made a mistake and actually corrected the minutes, and when Hans Jekyll got the first set of minutes, he testified, he said they were wrong, it wasn't what the board had agreed. And the second set was correct, that the money had been paid from Switzerland down to purchase the RAS to land, and then that money was repaid as a loan repayment. Those minutes were absolutely correct, and that's what the Jekyll and Defendant's expert testified to when he said he followed the money, that those minutes matched exactly what had occurred. The district court had also erred in finding fraudulent transfers because the statute of repos barred that particular transfer, the $10 million transfer and the transfer made to Swiss Leisure Group, and the district court erred in awarding attorney fees because Nevada requires that there be a specific express statute that allows fees, and this statute does not allow fees. It can be an item of damage, but the plaintiffs did not plead and or prove damages, and I see I am going over my time, so with the court's permission, I'd like to reserve the remaining for rebuttal. That's fine. Good afternoon. We're going to increase your rebuttal time to two minutes. Good afternoon, Your Honor. John Conlon of Mayor Brown for the plaintiff appellees. The district court's findings of fact here are specific. Who are the plaintiff appellees at this point? They are mutual funds, Your Honor. The management of the mutual funds has changed over time, but the ultimate owners are individual investors in mutual funds, who, again, may have changed over time. This isn't a big point, although it does come up as an issue, but I have to say I tried to figure out who they were, and the briefs don't tell me. There's a corporate disclosure statement. It never identifies what entities are being talked about. It's kind of hard for me to make sure there's not a conflict someplace unless I really know who the parties are, so perhaps you could file a letter following argument, letting us know who's really involved in this case, because I don't think I know. Sure, Your Honor. We will clarify who the parties and interests are as plaintiffs. With respect to the claims, the district court's findings, in fact, were specific and well-founded. They're based on eight days of trial, hundreds of exhibits, and thousands of pages of testimony, virtually all of which were produced by the appellants. The conclusions of law are well-grounded and statutory in common law. With respect to personal jurisdiction, the initial ruling of the court, which is on appeal here, is on the motion to dismiss. In the motion to dismiss, the appellants argued that, under Nevada law, there was a failure to allege alter ego, and that is why the initial decision did not address Delaware law. And with respect to Your Honor's question regarding whether there were acts of the defendants that did occur in Nevada, there's ample evidence in the record that there were. First, there was the finding of alter ego. Based on that finding alone, as I think even now appellants concede, there would be personal jurisdiction over all the defendants. Moreover, there were specific findings regarding the acts of the defendants in Nevada, which would support jurisdiction independent of a finding of alter ego, and in particular would support personal jurisdiction with respect to the fraudulent conveyance claims. These include travel to Nevada seven or eight times a year in connection with the operation of the resort, regular communications with representatives of SCGC in Las Vegas, obtaining a license from the Nevada Gaming Commission, and Mr. Jekyll in fact maintained a residence in Nevada. Can I ask which state's law governs the alter ego analysis? Because the district court looked to Nevada law, and I don't see that there's a decision of the Nevada Supreme Court directly on this point, but the district court thought Nevada would apply the second restatement substantial relationship test, but the restatement has a more specific rule for these kinds of claims that looks to the state of incorporation. So I guess I'm asking why isn't Delaware law the right answer to that question? Well, Your Honor, the court, and I think properly so, did look to the restatement. There's reporter's note section 307, which reserves to a state the prerogative of asserting its own laws where it would be appropriate to vindicate that state's interest in the circumstances of the case. How is Nevada's interest so important with regard to the note purchase agreement? Well, with respect to the note purchase agreement, Your Honor, it isn't. With respect to the conduct of defendants in stripping all the assets of SCGC and disregarding all of its corporate formalities with respect to that company to render it judgment-proof, with respect to those acts, Nevada has a great interest. And among the factors that the courts consider, the misrepresentations occurred in Nevada. The project involves a Nevada real estate project. SCGC's only place of business during the relevant period was Nevada. Its sole corporate purpose was to build a casino in Nevada. They maintained all of their bank accounts in Nevada. They owned six Nevada corporations that operated only in Nevada. And finally, SCGC and its officers were engaged in gaming activities in Nevada in which Nevada has an interest in monitoring. With respect to the issue of whether it makes a difference which law applies, ultimately, Your Honor, as we submitted, it really doesn't matter. Under both Nevada law and Delaware law, the district court made sufficient findings of fact to satisfy the requirements of both states' law. Under Nevada law, there's a three-part test which the specific findings of the court have amply demonstrated were satisfied. The appellants were influenced and governed SCGC. There was such unity of interest and ownership that SCGC and appellants were inseparable from each other and adherence to the corporate fiction of separate entity would sanction fraud or promote manifest injustice. The requirements under Delaware law are quite similar and they include whether the company was adequately capitalized, whether the company was solvent, whether corporate formalities were observed, whether the dominant shareholder siphoned company funds, and whether in general the company simply functioned as a facade for the dominant shareholder. The same facts that support piercing the corporate veil under Nevada law supported under Delaware law. As to representations that... Morgan Stanley is not unfamiliar with corporate form. I'm not sure that they're still in this case, but I'll go ahead and use them since they were in this case. I have some reluctance to discard corporate formality quite so quickly, given that the other party in the transaction, Morgan Stanley, knew exactly who it was dealing with. It knows who signed the note purchase agreement and knows who did not sign the note purchase agreement. And I'm sure there's no shortage of 100% owned and controlled subsidiaries by Morgan Stanley and by companies it advises in its corporate finance capacity. And I don't think they would want to be quick to say, well, just because one controls the other, that means we merge them together for this purpose. What is it about the facts here that really justify piercing the corporate veil in favor of a party who knows exactly who signed the note purchase agreement and understands corporate formalities? Well, Your Honor, I think there's several reasons. One, the first of which is that corporate formalities were not followed by SCGC. They fabricated board minutes. They fabricated accounting entries when they were facing disclosure requirements in bankruptcy court in Nevada. There were one set of board minutes that were set up before disclosure was required. There were one set of books that were set up before disclosure was required. Those minutes, there was not corrected minutes set up entirely separate minutes for entirely separate corporations within the SCGC family. The board, the financial records were not corrected. They were changed. At all times, Mr. Jekyll maintained complete control of the corporation. Funds were rooted at his direction for his benefit at a time when the company had outside debtors. So when you move off the corporate forum points, the minutes and so forth, that I get. But the idea of domination and control, that regularly happens in a wholly owned subsidiary situation. And that's the kind of situation that Morgan Stanley is not unfamiliar with. And so I go back to really the original question. They knew who they were dealing with in the note purchase agreement. What should give them the right to expand the liable parties beyond the party they were actually signed up to deal with? Well, Your Honor, they knew who they were dealing with. What they didn't know was that insiders at the company would strip that company of all assets and render it unable to pay its judgment. It did have assets. It did have assets to pay, if not the judgment in full, at least a portion of the judgment. And that was not a risk that Morgan Stanley knowingly took. They took a credit risk with their counterparty, but not a fraud risk that their counterparty was going to engage in fraud, going to fraudulently transfer funds out of the reach of debtors to recipients in Switzerland and otherwise do everything it could to render itself unable to pay its outside debtors to the benefit of its insiders. So for the moment, accepting that answer, why should we expand the liability beyond the fraudulent transactions that have been proven up? And I think $15 million was the number I reached and counsel reached. Why should that result in an alter ego judgment of more than twice that? Well, Your Honor, insiders, people who influence and govern a corporation, are only entitled to the protection that the corporate form offers if they abide by corporate formalities. And Nevada has a specific statute and it lays out the elements which, if proven, expose the officer-director-shareholder to liability for the debts of the corporation. And here, the overwhelming evidence has established each and every one of those elements. So really looking at the corporate formalities as the key to this. Well, corporate formalities and the acts of fraud. It's not just that money was transferred, and it's not simply a matter of not keeping minutes or not having enough meetings. It's that records were fabricated. They were hidden. So meetings were not conducted on any sort of regular basis. Outside directors were forced out of the company, and this company was managed and controlled by a small code array of Swiss people, many of whom did not even have any position at SCGC. They were acting at the sole direction of the defendants, Mr. Jekyll and his Swiss companies. Counsel, if I could interject a question. When funds were, in your terms, drained out of Seventh Circle, did those funds go to the corporations that ended up holding or being responsible under the piercing the corporate veil theory? They did, Your Honor. Yes, they went to, well, most of those transfers went to the defendants here, yes. There was, I think, one other transfer that went to someone other than the appellants. Okay, thank you. I think you're over your time. That's how it appears, Your Honor. Well, we should be over with our questions. Thank you, Your Honor. Jason Kirshner for Mayor Brown for Plaintiffs Appellees. I'd like to focus my limited time on the trial court's holdings relating to the UFTA claims, which were supported by exceptionally detailed findings of fact and conclusions of law. Appellant's first argument, which is that the claims are time barred, is one that was briefed and rejected not once or twice, but three times by the trial court. In arguing that NRS 112.230 is a statute of repose that cannot be equitably told, appellants disdainfully characterized Berry v. Elezra, the only Nevada decision that has considered this precise issue as a, quote, rogue decision. Far from a rogue decision, the court in Berry reasoned that NRS 112.230 was not a statute of repose for at least two reasons. First, the court noted that Nevada's statute of limitations for fraud references NRS 112.230, indicating that the statute, quote, takes the place of the general statute of limitations for fraudulent conveyance claims. Second, the court observed that NRS 112.230 includes a tolling provision, which is significant because, quote, tolling provisions are not associated with statutes of repose. Appellants are similarly dismissive of the trial court's thoughtful analysis, asserting that the court, quote, meandered through decisions of the Nevada Supreme Court. However, the trial court's analysis was far from meandering. To the contrary, the court correctly observed that the Nevada Supreme Court, quote, has identified its statutes of repose as exclusively three different sections enacted in 1983, all of which relate to defects in construction. The court concluded that those are the only ones that's identified. But has the Nevada Supreme Court said these are the only ones that there are? Not to my knowledge, Your Honor. And so what do we do then with this is a uniform statute, and there's a provision of it that says that one of the goals is to promote uniformity, and we have decisions of other states treating it as a statute of repose. Why isn't it reasonable to infer that the Nevada Supreme Court would be influenced by those decisions and reach a similar conclusion? Well, I think the court found that there was no compelling reason to find that the policy rationale behind Nevada's statute of repose extended to this radically different context. And I think that argument, you know, holds here where, you know, Pellants failed to cite to any decision of any court in Nevada that contradicts the court's conclusion on that point. Counsel, Judge Stuhl, if I could interject, what would be wrong, if anything, with certifying a question to the Nevada Supreme Court to ask it if this particular statute is a statute of limitations or a statute of repose? Well, I think, Your Honor, we would argue that even if 112.230 were a statute of repose in this particular case, plaintiff's fraudulent transfer claims would still be timely because the one-year savings period did not begin to run until plaintiffs identified the fraudulent nature of the transfers. So I don't know if this would be the particular case where it would make sense to certify that question. As we demonstrated in our brief, the plaintiffs did, I mean, as we discussed in our brief, the plaintiffs did not discover the fraudulent nature of the transfers until months before they filed the complaint. And most courts interpreting the UFTA held that it is the discovery of the fraudulent nature and not the transfer itself that triggers the one-year period. Pellants also argue in their reply brief that it, quote, for plaintiffs to assert that they had no reason to discover the fraudulent natures of the transfers earlier. But the evidence that they cite to, such as a deposition transcript that mentioned a $10 million wire, at best only put plaintiffs on notice of the transfers and not their fraudulent nature, which was not discovered until post-judgment discovery on the New York judgment in 2005. Pellants also argued that the trial court erred in finding actual and constructive fraud, and in so doing, as opposing counsel argued, they asked this court to credit their experts' conclusory opinion that, quote, the transfers were reasonable and had a business purpose over the court's well-reasoned findings of fact based on documentary evidence of altered board minutes and financial records, as my colleague referred to. Given that the court heard evidence for nearly two weeks and set out detailed findings of fact on this issue, Pellants fall far short of demonstrating clear error. Specifically, Pellants falsely complained in their reply brief that the trial court made no mention of the expert and self-serving testimony on which they rely. But the court specifically referenced Mr. Jekyll's testimony, noting that, quote, the notion that the $10 million was a repayment of a loan wired through Hans Jekyll's personal account for expediency is false. In any event, the court is not required to replay the entire trial in its findings of fact, and the failure to consider evidence is reviewed for clear error, a threshold that Appellants cannot possibly reach here. Lastly, Appellants challenged the court's decision to award a plaintiff's attorney's fees based on the UFTA, but each of Appellants' three arguments fail. First, they wrongly argue that the court disregarded the American rule, even though the court carefully explained that Section 7 of the UFTA provides authority to grant attorney's fees as a form of, quote, any other relief the circumstances may require. Second, Appellants incorrectly contend in their reply that plaintiffs concede that they did not provide any evidence of attorney's fees as an item of damage at trial. However, it would have made little sense to brief the issue of fees before plaintiffs had prevailed at trial. Rather, the propriety and reasonableness of plaintiffs' fee request was thoroughly briefed in connection with plaintiffs' post-trial motion for fees as is customary. And third, although Appellants claim that the court failed to consider the reasonableness of the request for fees, which is not true, they failed to challenge the propriety of any single entry in any of the 42 pages of entries detailing such fees. This failure is unsurprising given that those fees were well-earned over more than 15 hard-fought years of litigation. And with that, I rest. Thank you. Stan, Stan, Stan. Stan, don't make such a statement. Appellant's counsel, good proceed. Thank you, Your Honor. I'll have to be brief. At the outset. Wait one second. The first question from the panel was. Stop, stop, stop. I'm sorry. I was saying to wait until the clock was set at two minutes. Stacey's now done that. Thank you, Stacey. So please proceed. Thank you, Your Honor. And I do apologize. I appreciate the difficulties over remote. The first question that the panel had for my colleagues was, who are the plaintiffs? That's actually a question that I had asked back at the summary judgment stage when I filed my summary judgment motion because I said that these plaintiffs had appeared to have transferred away their rights and no longer existed. Five days before trial, the plaintiffs filed a motion to substitute plaintiffs. And they claimed that they had assigned their litigation interest to these other Invesco parties. And there were a series of assignments that had taken place. I asked for discovery on this issue. That was not ruled on until after the trial. There was no actual plaintiff that testified. I was not able to cross-examine anybody at trial about what interest was actually transferred or if one was transferred. And this is important because Nevada is one of those unique jurisdictions where you cannot transfer certain claims. And Nevada does not permit you to transfer fraud claims. And so in the case of alter ego, where an element is a fraud or manifest injustice, or as the Delaware courts say, fraud or something like it, and in the case of a fraudulent transfer, those claims are not transferable. They're not assignable. Now, my colleague had also referenced the statute of repose that is listed in the Fraudulent Transfer Act. And any analysis of a statute begins with the express language that is laid out in the statute. And the express language in the statute says that a claim is extinguished unless it is brought within four years after the transfer was made. It is not after the fraudulent nature of the transfer was made. It is after the transfer. Other states have used that language, fraudulent nature. Nevada does not. And the interpretation should be in harmony with other states as typical as the uniform law. And I see my time is over, so I'm happy to answer any questions if the court permits, or I'll yield. Thank you, counsel. Judge Clifton, Judge Miller, any questions? I have no questions. I think that will conclude our argument. And the Morgan Stanley case v. Jacklin shall now be submitted. The parties will hear from us in due course. Once more, I thank counsel for appearing remotely and for your excellent advocacy.
judges: Gould, Clifton, Miller